NO. 94-215

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995


IN RE THE MARRIAGE OF

HILDA BINSFIELD,

      Petitioner and Respondent,

  and

NICHOLAS HENRY BINSFIELD,

      Respondent and Appellant.

**FILED**

JAN 19 1995

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade,
                The Honorable Joel G. Roth, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Don A. Labar and Royce A. McCarty, Jr.
          Attorneys at Law; Church, Harris, Johnson &
          Williams, Great Falls, Montana


      For Respondent:

          E. Lee LeVeque, Attorney at Law;
          Conklin, Nybo, LeVeque & Murphy,
          Great Falls, Montana


Submitted on Briefs:  October 28, 1994

Decided:  January 19, 1995

Filed:

_____
        Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Nicholas H. Binsfield (Nicholas) appeals from the findings of fact, conclusions of law, and decree entered by the Eighth Judicial District Court, Cascade County, dissolving his marriage to Hilda Binsfield (Hilda). We affirm.

We consider the following issues on appeal:

1. Did the District Court err in denying Nicholas' motion to compel Hilda to submit to a psychological examination?

2. Did the District Court err in making an equal distribution of the marital assets?

3. Did the District Court err in awarding Hilda an in-kind distribution of real property?

Nicholas and Hilda were married on September 1, 1956, in Power, Montana. Prior to the marriage, Nicholas purchased a one-half interest in his family's farm a few miles south of Great Falls on the Missouri River; his brother owned the other one-half interest in the farm. Their father retained a life estate in the farm. In the early 1940s, Nicholas had purchased approximately 480 acres of land adjacent to the family farm for $2,000.

Hilda lived in Germany and Switzerland before immigrating to the United States in 1955. While in Europe, Hilda had a son, Anton Giger, and was married for a period of time.

When Nicholas and Hilda married, Hilda moved onto the family farm and her son Anton moved to California. Hilda and Nicholas lived on the farm with Nicholas' brother and father. Nicholas

2

farmed full-time, and Hilda performed the duties of a homemaker for the three men. Nicholas' father died in 1963; his brother died in 1970.

At the time of the dissolution, Nicholas was 83 years old and Hilda was 81 years old. Nicholas owned nearly 800 acres of land including all 320 acres of the family farm. The 800 acres had an appraised value of $546,000. In addition, he held bonds, savings accounts, and other income-producing property worth approximately $578,656. All of these assets were held solely in Nicholas' name. At the **time** of dissolution, Hilda possessed just over $1,400 in three bank accounts. She received about $260 per month in social security benefits and approximately $390 per month in pensions from the German and Swiss governments for work performed in those countries prior to her **immigration** to the United States.

Early in 1993, Hilda was diagnosed as having a brain tumor. She testified that she was concerned she would not survive. She asked Nicholas to provide farm land for her son Anton. Hilda testified that Nicholas replied that Anton could work on the land, but would never own any of it. This refusal prompted Hilda's interest in seeking a dissolution. The Mayo Clinic in Rochester, Minnesota, successfully treated Hilda's tumor.

After returning from the Mayo Clinic, Hilda filed a petition for dissolution. Nicholas responded, denying that there were irreconcilable differences between the parties and asserting that Hilda lacked the mental capacity to petition for dissolution. Nicholas requested that Hilda's petition be dismissed or, in the

alternative, that the property and debts of the parties be equitably divided.

On December 1, 1993, Nicholas moved for an order to show cause why Hilda should not be compelled under Rule 35(a), M.R.Civ.P., to submit to a psychological examination. The District Court held a hearing and denied Nicholas' request. We denied Nicholas' subsequent application for a writ of supervisory control on the issue.

After a bench trial, the District Court entered a "bare" decree of dissolution because Hilda's counsel was concerned that none of the marital property was in her name and that one of the parties might die before the decree of dissolution was entered. On February 24, 1994, the court entered its findings of fact, conclusions of law, and decree.

The District Court evenly divided future crop and annuity payments and awarded Nicholas and Hilda personal property worth $13,395 and $2,685, respectively. Nicholas received the farmstead and five acres worth $30,000, and the court ordered the remainder of the farm property, worth $516,000, divided evenly between the parties. The division was to be accomplished by Nicholas dividing the remaining acres into two parcels of approximately equal size and value and permitting Hilda to choose the parcel she preferred. To account for the disproportionate amount of personal and real property Nicholas received, the court awarded Hilda investments worth $309,683; Nicholas was awarded investments worth $268,973. The assets each party received totalled approximately $626,902.

4

Nicholas appeals.

Did the District Court err in denying Nicholas' motion to compel Hilda to submit to a psychological examination?

Nicholas moved the court to compel Hilda to submit to a psychological examination pursuant to Rule 35(a), M.R.Civ.P., which states in relevant part:

> When the mental or physical condition (including the blood group) of a party . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

The language of the rule is discretionary. It authorizes, but does not require, a district court to order a party to submit to a psychological examination when the party's mental condition is in controversy and good cause is shown. We will not reverse a court's discretionary determinations absent an abuse of discretion. In re Marriage of Rada (1994), 263 Mont. 402, 405, 869 P.2d 254, 255.

We previously have interpreted Rule 35(a) in the context of criminal cases in which a defendant sought to compel a victim to submit to a physical or psychological examination. In those circumstances, we consistently held that Rule 35(a) was not applicable because the victim was not a party to the proceeding. See State v. Little (1993), 260 Mont. 460, 468, 861 P.2d 154, 159; State v. Goodwin (1991), 249 Mont. 1, 18-19, 813 P.2d 953, 964; State v. Gilpin (1988), 232 Mont. 56, 67, 756 P.2d 445, 451; State v. Liddell (1984), 211 Mont. 180, 191, 685 P.2d 918, 924. Those

cases provide no authority for, or guidance in, resolving the issue presently before us.

The United States Supreme Court interpreted Rule 35(a) of the Federal Rules of Civil Procedure, upon which Montana's Rule 35(a) is based, in Schlagenhauf v. Holder (1964), 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152. In that case, a party filed suit based on an accident between a bus and a tractor-trailer. One of the parties alleged that the driver of the bus was neither physically nor mentally fit to drive a bus at the time of the accident. The party moved to compel the bus driver to submit to various physical and mental examinations pursuant to Rule 35(a), F.R.Civ.P.

In vacating the lower court's order allowing the examinations, the Supreme Court focused on the rule's "in controversy" and "good cause" language. It noted that the "in controversy" and "good cause" requirements:

> are not met by mere conclusory allegations of the pleadings--nor by mere relevance to the case--but require an affirmative showing by the movant that each condition as to which examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. . . . Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of "in controversy" and "good cause" . .

Schlaaenhauf, 379 U.S. at 118-19.

In the present case, Nicholas submitted several affidavits and presented witnesses at a hearing regarding the possible necessity of a psychological evaluation. He testified that Hilda's petition for dissolution was unexpected and unusual. Based on a review of

6

Hilda's medical records, a psychologist testifying for Nicholas stated that Hilda "may" lack the mental capacity to make her own decisions and that it would be difficult to determine her capacity via an interview or question and answer format. The psychologist had never met or talked to Hilda; nor was his testimony relating to her possibly deficient mental capacity based on any personal observation of her. Hilda testified on her own behalf at the hearing. After listening to Hilda's testimony, the District Court stated:

> I've been observing Mrs. Binsfield ever since we've been in court here. I must admit now, based upon her testimony here, both on cross and on direct, there's really little doubt in my mind but what this lady is competent. She knows what she's doing.

Later, the court added: "I'm satisfied after having heard this lady [Hilda] that she does know what [she is] doing."

Applying the Schlagenhauf standard here, it is clear that Nicholas relied on speculative and conclusory testimony by a psychologist who had no personal knowledge of Hilda or her mental capacity. He made no affirmative showing that Hilda's mental capacity was genuinely in controversy. See Schlagenhauf, 379 U.S. at 118. We conclude that such evidence is wholly inadequate to meet Nicholas' initial burden of establishing the existence of the "in controversy" and "good cause" requirements of Rule 35(a), M.R.Civ.P.

Nicholas relies on In re Marriage of Tesch (1982), 199 Mont. 240, 648 P.2d 293, in support of his argument that the court should have ordered a psychological examination. His reliance is

7

misplaced.

In _Marriage of Tesch,_ the husband obtained a default dissolution from his wife, who was almost totally incapacitated by multiple sclerosis. At the hearing prior to entry of the default judgment, both the husband and his attorney informed the court that they believed the wife was competent; neither the wife nor a representative of the wife was present. After the district court entered the default dissolution, the wife moved to set aside the judgment. The district court denied the wife's motion. We reversed on appeal, noting that:

> [t]he wife is totally disabled by multiple sclerosis.
> Such a disability, in itself, might warrant the setting
> aside of the default judgment. Here, however, other
> circumstances also support the setting aside of the
> judgment. Nothing on the record addresses the question
> of the wife's competency or her voluntary relinquishment
> of her interests in the farm. . We emphasize that
> the crucial problem with this case is that nowhere are
> the desires of the wife on record.

_Marriage of Tesch,_ 648 P.2d at 296-97.

Here, unlike in _Marriage of Tesch_, the District Court held a separate hearing to determine the merits of Nicholas' motion to require Hilda to submit to a psychological examination. As a result, the record before the trial court and this Court does address the question of Hilda's mental capacity and desires. Indeed, Hilda testified on her own behalf, providing the court the ability to determine whether Hilda's mental capacity was genuinely in controversy and whether good cause was established to compel her to submit to a psychological examination. Noting that none of the marital property was in her name and that Nicholas had informed her

8

that Anton would not receive any of the farm land, Hilda voiced her concerns that she would die without providing for her son Anton. Hilda adequately informed the court of her desires and demonstrated her mental capacity to the court's satisfaction. We hold that the District Court did not abuse its discretion in denying Nicholas' motion to compel Hilda to submit to a psychological examination.

Did the District court err in making an equal distribution of the marital assets?

The distribution of the marital estate is controlled by § 40-4-202, MCA, which provides in relevant part:

(1) In a proceeding for dissolution of a marriage . . the court, without regard to marital misconduct, shall , finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both . . .

This statute vests the district court with broad discretion to apportion the marital estate in a manner which is equitable to each party under the circumstances. In re Marriage of Zander (1993), 262 Mont. 215, 221, 864 P.2d 1225, 1229. When a district court's findings of fact regarding marital property distribution are not clearly erroneous, and when substantial credible evidence supports the findings and judgment, we will not alter a district court's marital property division absent an abuse of discretion. In re Marriage of Maedje (1994), 263 Mont. 262, 265-66, 868 P.2d 580, 583 (citations omitted).

Nicholas argues that an equal division of the marital assets is inequitable in this case. His position is based on assertions that he brought most of the assets into the marriage with him; the

9

District Court did not trace several of his "E Series" savings bonds as premarital assets; some of the savings bonds are in both his and his sister's names; the court incorrectly valued a pickup and trailer; and the court failed to consider Hilda's dissipation of the marital estate.

At the **time** of the parties' marriage, Nicholas owned approximately 480 acres of land in his own name and a one-half interest in his father's 320 acre farm, with his father retaining a life estate. During the marriage, he inherited another portion of the farm and money with which he acquired the remainder. Nicholas testified that he had other assets prior to his marriage; his testimony was vague, however, regarding the value of these assets.

When dividing property acquired prior to the marriage or through inheritance, a district court must consider the contributions of the other spouse, including the nonmonetary contribution of a homemaker, the extent to which such contributions facilitated the maintenance of the such property, and whether the property division serves as an alternative to maintenance arrangements. See § 40-4-202(1), MCA. Here, it is apparent from the District Court's extensive findings of fact that Hilda's contributions as a homemaker and general farmhand substantially contributed to the maintenance of the property that Nicholas brought into and acquired during the marriage. The District Court made a separate finding addressing dozens of household and farm-related tasks Hilda routinely performed during the 37-year

10

marriage. In addition, Hilda was not awarded maintenance in the dissolution. We conclude that the District Court did not abuse its discretion by including the properties Nicholas brought into the marriage and inherited during the marriage in the marital estate.

With regard to the Series E savings bonds, Nicholas testified that he believed all of the bonds were purchased prior to his marriage. However, the only documentary evidence regarding the bonds was the accounting of Nicholas' brother's estate. Based on that accounting, the District Court found that only 3 of 10 bonds in Nicholas' and his brother's names were purchased in 1943 and the remainder were purchased after 1956, the year Nicholas and Hilda married. The three premarital bonds owned by Nicholas had a value of only $550.32 sixteen years after the marriage, and no evidence of their value at or around the time of the parties' marriage was introduced.

The District Court properly could have separated the value of these premarital assets only where sufficient evidence was presented to trace the assets and their value to a time before the marriage. See In re Marriage of Miller (1989), 238 Mont. 197, 203-04, 777 P.2d 319, 324. No such evidence was presented here. We conclude that the District Court's findings regarding the bonds were not clearly erroneous.

We decline to address Nicholas' argument that the court erred in distributing the value of bonds which included his sister as an alternate payee. Nicholas did not object to the inclusion of the bonds in the marital estate on this basis in the District Court.

11

We will not entertain issues raised for the first time on appeal. In re Marriage of Prescott (1993), 259 Mont. 293, 299, 856 P.2d 229, 232-33.

Nicholas also contends that the court erred in valuing a pickup truck and a trailer. At trial, Nicholas testified that the value of the truck was $3,800 and the value of the trailer was $1,500. Hilda's son Anton testified that he believed the truck was worth about $6,000 and the trailer worth $2,500. The court used Anton's valuation for the truck and Nicholas' valuation for the trailer. We conclude that there was sufficient evidence to support the District Court's valuation of the pickup truck and the trailer.

Nicholas further argues that the court erred by failing to include some of Hilda's assets in the marital estate. These assets were the monies contained in three bank accounts totaling $1,424.70 at the time of the dissolution hearing. While the District Court did err in failing to make findings regarding the $1,424.70, we conclude that the error was harmless in the context of the District Court's equal distribution of a marital estate valued at more than $1.2 million.

Finally, Nicholas contends that the division of the marital estate is inequitable because the District Court did not consider Hilda's dissipation of the marital estate. Nicholas argues that Hilda's failure to save her pension money and alleged gifts of money to Anton's father constituted dissipation of the value of the marital estate to an extent that the District Court was compelled to take into account in distributing the marital assets. We

12

disagree.

We have stated that any finding of dissipation must be supported by substantial evidence. In re Marriage of Stewart (1988), 232 Mont. 40, 43, 757 P.2d 765, 767. In the present case, Hilda testified that she used her pension money for household items and gave some money to her son Anton. She denied that she had given any money to Anton's father. In addition, Hilda was inordinately frugal throughout the marriage and this frugality aided in the acquisition and preservation of marital assets. We conclude that the District Court did not err in failing to find that Hilda dissipated the marital estate.

We hold that the District Court did not err in making an equal distribution of the marital assets.

Did the District Court err in awarding Hilda an in-kind distribution of real property?

The District Court awarded the family home and the five acres upon which it sits to Nicholas. The court also awarded each of the parties one-half of the remaining real property acreage. The court adopted a method of division whereby Nicholas was to divide the property in half, excluding the five-acre homestead, and Hilda was to choose one of the parcels. Where substantial credible evidence supports a district court's findings and judgment distributing a marital estate, this Court will not alter that decision absent an abuse of discretion. Marriage of Maedje, 868 P.2d at 583.

Nicholas correctly relies on In re Marriage of Glass (1985), 215 Mont. 248, 258, 697 P.2d 96, 102, for the proposition that

13

Montana's policy in favor of keeping a family farm intact may be considered in distributing marital property after it has been allocated. No authority is cited, however, and we have located none, in support of the proposition that a family farm must be retained intact.

Here, the District Court did not maintain the unity of the family farm. Under the circumstances before us--where Hilda lived on the farm for 37 years, is 81 years old and expressed her desire to remain on the farm--we cannot conclude that the District Court abused its discretion in ordering that the farm be divided.

In addition, we previously have approved a method of dividing a family ranch in a dissolution proceeding similar to that used by the District Court here. In re Marriage of Hancock (1987), 226 Mont. 383, 736 P.2d 101. In Marriage of Hancock, we stated that "[t]he method employed by the lower court will generally result in an equal division. The party drawing the dividing line is essentially forced to make an equal partition. Otherwise, he risks receiving the smaller parcel left after the other party chooses." Marriage of Hancock, 736 P.2d at 102. We hold that the District Court did not err in awarding Hilda an in-kind distribution of real property.

Affirmed.

_____
Justice

14

We concur:

William E. Hunter

Tom Trieweiler

_____

_____
Justices