No. 98-461

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 208N

IN RE THE MARRIAGE OF

ANNETTE L. EFTA,

Petitioner and Respondent,

and

RONALD S. EFTA,

Respondent and Appellant.

APPEAL FROM: District Court of the Seventh Judicial District,

In and for the County of Wibaux,

The Honorable David Cybulski, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lorraine A. Schneider, Schneider & Howe, P.C.; Glendive, Montana

For Respondent:

W. Corbin Howard, Attorney at Law; Billings, MT 59103-7177

Submitted on Briefs: April 22, 1999

Decided: September 9, 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Annette Efta filed a petition for dissolution of her marriage to Ron Efta in the District Court for the Seventh Judicial District in Wibaux County. The District Court entered a decree which divided the marital estate, awarded custody of the couple's minor child, and decided the issue of child support. Ron Efta now appeals the District Court's Findings of Fact, Conclusions of Law, Property Distribution, and Final Decree of Dissolution. We affirm the final decree of the District Court.

¶3 The following issues are presented on appeal:

¶4 1. Did the District Court err when it valued the marital estate at the time of trial rather than at the time of the parties' separation?

¶5 2. Did the District Court err by its allocation of the parties' assets and debts?

¶6 3. Did the District Court err when it awarded attorney's fees and costs to Annette?

¶7 4. Did the District Court err when it did not award Ron child support and medical expenses for the couple's minor child, and when it adopted the terms of the final parenting plan?

## FACTUAL BACKGROUND

¶8 Annette and Ron Efta were married in 1975. Annette had completed college and was a teacher at Billings Senior High School at the time of the marriage. Several days after the wedding, Annette and Ron moved to Missoula so that Ron could attend law school. Annette quit her job and converted her retirement funds to cash, so that she could accompany Ron. During their marriage, the couple had three children. Annette taught school for one year after returning to Wibaux, but stayed home to care for the children after their second child was born. Throughout their marriage, Annette was the primary care giver for the three children. Annette helped out on the farm when asked, but her primary responsibilities were raising the children and caring for the family home. Annette eventually returned to teaching and at the time of trial was a tenured teacher with 12 to 13 years' experience.

¶9 When Ron and Annette moved back to Wibaux from Missoula in 1978, they purchased a home with a $30,000 loan from Annette's parents. They paid back all but $7000 of the home loan. Annette's parents forgave the remaining $7000.

¶10 Ron's mother died in 1989, and in 1990 Ron bought his mother's farm. Annette's mother loaned Ron $50,000 to help him purchase the farm. Ron paid back all but $10,000 of the loan. Annette's parents forgave the remaining amount.

¶11 During the course of their marriage, Annette's parents were very generous to both Ron, Annette, and their children. Annette's parents established a mineral trust for Annette and her siblings, and investment accounts for Annette and her three children. Annette used gift money from her parents and borrowed money from her children's investment accounts to purchase an apartment building in Billings with her sister. None of the money for the apartment building came from Ron, and he was not in any way involved in the purchase.

Annette's parents managed the apartment building. The apartment building losses were used to reduce Annette's and Ron's joint tax liability.

¶12 In 1995, Ron moved out of the family home and into the farm house. At that time, Ron had completely paid off the debt related to the purchase of the farm. Annette continued to care for the children, and from time to time washed and ironed Ron's clothes. Annette also returned to teaching full-time.

¶13 The District Court valued the marital estate at the time of trial in March 1998. The District Court set aside the gifts that Annette had received from her parents and the apartment building as Annette's separate property. The District Court also set aside as Ron's separate property the amount of the inheritance from his mother that he used to purchase the farm, and found that the remaining value of the farm had been acquired with marital assets. The District Court, therefore, found that the remaining value of the farm was marital property. Additionally, the District Court found that both parties contributed substantially to the marriage, and that Annette's care for the home and children allowed Ron to aggressively pursue his law practice.

¶14 The District Court divided the marital estate, and ordered Ron to pay to Annette the sum of $261,797 to equalize the distribution, plus the $35,000 agreed upon for the marital home. The District Court also found that Ron's earning potential was substantially greater than Annette's, and that Ron, therefore, should pay more of their daughter Meghan's expenses. Neither parent was ordered to pay child support to the other, and Ron was not required to pay child support to Annette for the care of Aaron and Meghan during the two years of separation while the children resided with Annette. The District Court further found that the voluntary direct payment of expenses by Ron during that time did not qualify as child support. Finally, the court held that it was appropriate to award Annette attorney's fees and costs due to Ron's "refusal to comply with the rules of discovery voluntarily," due to his three motions to continue trial dates, and due to the disparity in income earning ability of the parties. The court stated that if the parties were unable to agree on an appropriate amount of reimbursement for attorney's fees and costs, then a hearing would be held.

## STANDARD OF REVIEW

¶15 This Court reviews a district court's division of marital property to determine whether the court's factual findings are clearly erroneous. *See In re Marriage of Robinson* (1994),

269 Mont. 293, 297, 888 P.2d 895, 897 (citing *In re Marriage of Maedje* (1994), 263 Mont. 262, 265-66, 868 P.2d 580, 583). If the findings are not clearly erroneous, we will affirm the District Court's distribution unless we conclude that it has abused its discretion. *See In re Marriage of Stufft* (1996), 276 Mont. 454, 459, 916 P.2d 767, 770 (1996).

¶16 Our standard of review of a district court's order granting or denying attorney's fees and costs is whether the district court abused its discretion. *See In re Marriage of Gingerich* (1994), 269 Mont. 161, 167-68, 887 P.2d 714, 718. Our standard of review of a district court's grant or denial of Rule 37, M.R.Civ.P., sanctions for discovery abuses is also an abuse of discretion standard. *See In re Marriage of Rada* (1994), 263 Mont. 402, 406, 869 P.2d 254, 256.

¶17 Finally, this Court also reviews district court child support determinations for an abuse of discretion. *See In re Marriage of Craib* (1994), 266 Mont. 483, 490, 880 P.2d 1379, 1383.

¶18 The standard of review of a district court's conclusions of law is whether its conclusions of law are correct. *See in Re Marriage of Brown* (1994), 263 Mont. 184, 187, 867 P.2d 381, 382 (citing *In re Marriage of Burris* (1993), 258 Mont. 265, 269, 852 P.2d 616, 619).

## ISSUE 1

¶19 Did the District Court err when it valued the marital estate at the time of trial rather than at the time of the parties' separation?

¶20 This Court has stated that as a general rule marital property must be valued at or near the time of dissolution. *See In re Marriage of Walls* (1996), 278 Mont. 413, 417, 925 P.2d 483, 485. The policy underlying the general rule is that determining past values of property and assets is difficult, if not impossible, in many instances.

¶21 However, Ron asserts that the parties had separated their financial affairs long before their physical separation; that neither participated in the other's separate business affairs; and, that their separate business properties were held solely in their own names. Ron also argues that he purchased additional farmland and equipment after the separation and that it was acquired solely in his name. The thrust of his argument is that these items should not have been included as marital property because he purchased them after he and Annette

had separated, and because he put them solely in his name. However, we have held that regardless who holds title, the court must take into consideration both spouses' contributions to the property's maintenance and preservation. *See In re Marriage of Engen,* 1998 MT 153, ¶ 29, 289 Mont. 299, ¶ 29, 961 P.2d 738, ¶ 29.

¶22 Ron's argument fails in view of the record and the District Court's findings. Simply because Ron acquired the tractor and land after he and Annette separated does not necessarily mean that marital assets were not used to acquire them. As the District Court found:

> Since the parties separated in June of 1995, Husband had exclusive control over virtually all of the income producing marital assets including his law practice and the farm. Wife has not had practical control of any marital assets other than the family home and her van. The assets and earnings accumulated following their separation arose from the law practice and farm, and are marital property.

. . . .

> Both parties contributed substantially to this marriage. Husband worked hard on the farm and his law practice throughout the marriage. Wife raised the children primarily and also resumed teaching when the children were older.

. . . .

> Because marital property under Husband's exclusive control was used to produce the income that purchased the assets during the separation, there is no equitable reason to value the marital estate at the time of separation.

¶23 The record demonstrates that Annette gave up her teaching job to move to Missoula so that Ron could attend law school. She then spent many years raising their children and taking care of the house, in addition to helping out on the farm when needed. Annette also taught for 12 to 13 years thereby contributing to the family's income. Pursuant to § 40-4-202(1)(a), MCA, the court was required to consider the nonmonetary contributions of Annette in her homemaking capacity.

¶24 Additionally, the court took into account and credited Ron with the fact that the

livestock had gained weight, that Ron had advanced the farm operation, and that the grain proceeds had been used to pay expenses since the time of separation. Therefore, the District Court did not include as marital property grain sold after November 21, 1997, which had a value of $62,060.25.

¶25 After carefully reviewing the record, we conclude that the District Court did not abuse its discretion when it valued the marital estate at the time of dissolution rather than at the time of separation.

## ISSUE 2

¶26 Did the District Court err by its allocation of the parties' assets and debts?

¶27 Ron raises numerous issues regarding the District Court's allocation of assets and debts. He asserts that the District Court erred when it failed to include Annette's interest in a Billings apartment building in the marital estate; when it found that Annette was going to sell stock in order to buy a house in Billings; when it considered Annette's tax consequences for the unsold stock, and did not consider the tax consequences to Ron of paying Annette $261,797 for equalization; when it included grain harvested in 1997 and used to pay debt prior to trial and then used the amount of debt Ron owed at the time of trial to value the marital estate; when it included debt incurred by Annette for her legal expenses, college expenses, and apartment building expenses; when it did not include Annette's interest in the H&V Mineral Trust established for Annette by her parents; and when it excluded the 20 cattle Ron owned prior to their marriage.

¶28 A. <u>Did the District Court err when it did not include Annette's interest in the Billings apartment building as marital property?</u>

¶29 Ron asserts that Annette's interest in the Billings apartment building should be included as marital property. The District Court, however, did not include Annette's interest in the apartment building because it found that:

> Her interest was a gift from her parents and her sister, Pat Emerson, made with certain tax advantages in mind. There has never been any marital investment of any kind in the apartment building. Husband has never seen the building. Wife has never rented an apartment to a tenant, mopped a floor or invested a penny of her own earnings in this asset. Wife's ownership interest

should be separately set over to her.

The District Court likewise set aside a portion of the farm, totaling approximately $108,224 as Ron's separate property, because that was the amount of money Ron inherited from his mother and used to partly fund the purchase of the farm. Pursuant to § 40-4-202, MCA, when dividing marital property acquired prior to the marriage or by gift or bequest, the District Court was required to:

[C]onsider those contributions of the other spouse to the marriage, including:

(a) the nonmonetary contribution of a homemaker;

(b) the extent to which such contributions have facilitated the maintenance of this property. . . .

*See also In re Marriage of Binsfield* (1994), 269 Mont. 336, 343, 888 P.2d 889, 893.

We conclude that the District Court did take the lack of such contributions into account when it found there has never been any kind of marital investment in the apartment building. The record demonstrates that neither Ron nor Annette invested money or time in the apartment building. We have construed § 40-4-202, MCA, to mean that regardless who holds the title, gifted property need not be included as a marital asset unless the nonacquiring party contributed to its preservation or appreciation. *See Marriage of Engen*, ¶ 29. Where the nonacquiring spouse contributes to the appreciation or preservation of gifted or preacquired property, she or he is entitled to an equitable share of the preserved or appreciated value. *See Marriage of Engen*, ¶ 29.

¶30 Our review of the record confirms that there was substantial evidence to support the District Court's finding that Annette acquired the apartment building interest with gift money from her parents, and that no marital assets were contributed for the purchase or maintenance of the building. We hold that the District Court's finding that it was Annette's separate property was not clearly erroneous.

¶31 B. <u>Did the District Court err when it considered the tax consequences to Annette for unsold stock, and when it did not consider the tax consequences to Ron for paying Annette the equalizing payment?</u>

¶32 At trial, Annette's sister, who is a CPA, testified that at the direction of Annette's

attorney, she computed the probable tax consequences of the sale of certain stocks so that Annette could reduce her debt and purchase a house in Billings.

¶33 Ron presented no evidence of adverse tax consequences that might result from having to pay Annette any money. The only testimony Ron offered regarding any payments to Annette was that he would have to borrow money to purchase Annette's share of the house in Wibaux.

¶34 This Court has held that:

> [W]here a property distribution ordered by a court includes a taxable event precipitating a concrete and immediate tax liability, such tax liability should be considered by the court before entering its final judgment.

*See In re Marriage of Beck* (1981), 193 Mont. 166, 171, 631 P.2d 282, 285. We have also held that:

> [A] District Court does not abuse its discretion by refusing to consider theoretical tax consequences when the court-ordered property distribution does not contemplate any taxable event which triggers present tax liability. But where a present tax liability will be triggered by the court-ordered distribution, the court must make allowance for such tax impact. . . . We hold, therefore, that at a new hearing, the trial court must consider any concrete and immediate adverse tax impact that a division of marital property might have on the parties.

*See Marriage of Beck,* 193 Mont. at 173, 631 P.2d at 285.

¶35 Although the District Court's finding of tax consequences to Annette was supported by substantial evidence, Ron failed to produce any evidence upon which the District Court could have determined whether and to what extent he would suffer any tax consequences. We have held that where only theoretical contentions are the basis for asserting tax consequences, that the District Court does not err by declining to consider them. *See In re Marriage of Turbes* (1988), 234 Mont. 152, 160, 762 P.2d 237, 241.

¶36 In this case, the District Court ordered that Ron pay Annette the equalizing payment in either property or cash. There was no evidence of tax consequences presented. Absent any

evidence of adverse tax impacts, Ron's claims are purely theoretical. Accordingly, we hold that the District Court did not err by its treatment of the parties' respective tax obligations.

¶37 C. <u>Did the District Court err when it included grain harvested in 1997 and used to pay debt prior to trial and then used the amount of debt Ron owed at the time of trial in valuing the marital estate</u>?

¶38 In Issue 1, we discussed the valuation of the grain. We held that the District Court did not err when it included grain inventoried on November 21, 1997, but excluded from marital assets the sale of grain after that date which had a value of $62,060. Ron presented no evidence that the proceeds from the sale of grain were used solely to pay debts. Moreover, the District Court found that Ron's cash flow in 1997 was $303,462, not including borrowed funds, and that:

> All of these funds arose from his exclusive control of marital assets. Husband used these assets not only to purchase other marital assets, but also for his own personal benefit and enjoyment. For example, he took an expensive vacation to Ireland, bought expensive tickets to the Minnesota Vikings football games, went to a bowling tournament in Nevada and so forth.

Ron presented no evidence that the grain money was used solely to pay down debt. The money could just as easily have been used to pay for the expenses that the court noted in its findings.

¶39 Ron also asserts that it is unfair to establish the amount of debt at the time of trial. Instead, he apparently argues that the debt should have been established at the same time that the grain was inventoried by Mr. McFarland, Annette's expert witness. However, the District Court valued all other assets at the time of trial. As Ron himself urges, the court should value all assets and debts as of the same time. That is what the court did. What the court also did, however, was to exclude from marital assets grain harvested and sold after November 1997. The court set aside the $62,060 profit from the grain as Ron's separate property. We conclude that the District Court did not err by its treatment of grain harvested in 1997 and its treatment of debt at the time of trial.

¶40 D. <u>Did the District Court err when it included debt incurred by Annette for her legal expenses, the children's college expenses, and apartment building expenses</u>?

¶41 As we have stated previously in this opinion, the District Court is granted broad authority to equitably distribute the marital property. *See Marriage of Robinson* (1994), 269 Mont. at 297, 888 P.2d at 897 (citing *Marriage of Maedje* (1994), 263 Mont. at 265-66, 868 P.2d at 583). Annette took out loans from her family to pay for her legal expenses related to this lengthy divorce. The District Court found that these were marital debts, and not separate debts chargeable to Annette. The court also found that Annette had taken out loans for the children's college expenses, and that they too were marital debts. The court included them as marital debts and credited them to Annette since she is the one who had to take out the loans and who is ultimately responsible for their repayment.

¶42 However, we can find no evidence in the record supporting the contention that the District Court counted any apartment building debts as marital debt. On the contrary, the distribution chart prepared by the court shows that all apartment building debt was credited to Annette as separate debt, not marital debt.

¶43 Our review of the record indicates that the District Court based its findings on substantial evidence, and that its allocation of debt was not clearly erroneous.

¶44 E. Did the District Court err when it did not include Annette's interest in the H&V Mineral Trust established for Annette by her parents as part of the marital estate?

¶45 Ron asserts that the District Court erred when it failed to make any findings regarding Annette's interest in the H&V Mineral Trust established for Annette by her parents. However, our review of the record indicates that the District Court did make findings regarding the H&V Mineral Trust. The court found that Annette's parents had created the trust and transferred a beneficial interest to Annette and her siblings, and that she had received $51,142 of income from the trust which she spent on her household and children. The $51,142 figure is the total of trust distributions through 1996 as shown on Exhibit A that Ron offered as evidence. The court made no further findings.

¶46 Ron urges that $27,000 of trust income should have been allocated to Annette. The basis for this contention is that approximately two years prior to trial an offer was made to lease 4150 mineral acres for $75 per acre. Annette has a vested one-quarter interest in the trust, and her portion of the profits, had the lease been entered into, would have been approximately $27,000.

¶47 However, nothing in the record indicates that such a lease was ever executed. In fact, during cross-examination, Ron's attorney asked Annette:

Q. Have you been advised that he [the person who made the lease offer]

testified he offered $75 per acre for about 4,150 net mineral acres?

A. I know nothing about that.

Q. You would get one-fourth of that sum, would you not?

A. Yes.

Q. The trust is divided in four equal shares between your siblings, correct?

A. Yes.

Q. And one-fourth of that would be roughly $27,000. Have you ever asked your mother why she didn't take that?

Ron and his attorney knew that the mineral lease had not been agreed upon. Nothing in the record indicates that Annette actually received $27,000. The only evidence presented shows that there was merely an offer, but no acceptance, of such a lease. Indeed, in Ron's appellate brief he states that it was only an offer. Had the court attributed $27,000 to Annette for this proposed lease it would have erred, because to do so would not have been supported by the evidence. We affirm the District Court with respect to this issue.

¶48 F. <u>Did the District Court err when it refused to exclude from the marital estate 20 cattle Ron owned prior to the marriage?</u>

¶49 The District Court found that there was no evidence that the current livestock could be traced to the livestock Ron owned 23 years ago, and that all of the livestock was marital property. The District Court had substantial evidence to support its finding. There was no evidence presented that current livestock were traceable to original livestock. Moreover, Ron did not present any evidence of the value of the original 20 cows. Ron correctly cites to *In re Marriage of Keedy* (1991), 249 Mont. 47, 50, 813 P.2d 442, 444, for the proposition that premarital property minus the contributions of the other spouse and the increased value since the time of marriage, should be excluded from the marital estate. *See*

*also Marriage of Engen*, ¶ 29. However, where no evidence of the value of property acquired prior to marriage is presented, the court cannot properly make findings and distributions regarding that property.

¶50 Furthermore, we have stated that where there is no evidence that any part of the premarital property can be traced to marital property, such property need not be treated separately by the court in making property distributions. *See In re Marriage of Miller* (1989), 238 Mont. 197, 777 P.2d 319. We conclude that the District Court did not err by including all of the couple's livestock in the marital estate.

## CONCLUSION

¶51 The District Court had broad equitable powers to distribute the marital property. *See Marriage of Robinson* (1994), 269 Mont. At 297, 888 P.2d at 897. This Court will not overturn the District Court's findings unless they are not supported by substantial evidence or are clearly erroneous. Our careful review of the record indicates that the District Court's findings regarding property were not clearly erroneous and that its distribution of property did not result from an abuse of discretion. Therefore, we affirm the District Court's allocation of the parties' assets and debts.

## ISSUE 3

¶52 Did the District Court err when it awarded attorney's fees and costs to Annette?

¶53 The District Court awarded Annette attorney's fees and costs in part due to the disparity in the earning potentials of the parties. The court also based its decision on Ron's refusal to voluntarily comply with discovery requests, and his dilatory manner of dealing with this lawsuit in general. As the District Court stated in its findings of fact:

> There is substantial disparity in income earning ability of the parties. Husband's refusal to comply with the rules of discovery voluntarily has required three motions to compel and two orders of this Court. He refused to comply with discovery rules and answer written discovery for over a year. Some of the items requested, the deposit slips from his accounts, were not delivered to Wife's counsel until less than a week prior to trial. Husband filed a petition for conciliation in the fall of 1996. He has filed three motions to continue trial settings. The last motion was based in part on his desire to

attend a bowling tournament the week prior to trial. Under these circumstances it is appropriate that Husband reimburse Wife her attorney's fees and costs.

We agree with the District Court on this matter.

¶54 Rule 37(a)(4) of the Montana Rules of Civil Procedure provides that the trial court may award the expense, including attorney's fees, of a successful motion to compel discovery. Likewise, Rule 37(d), M.R.Civ.P., provides that attorney's fees and costs may be awarded for failure to answer interrogatories or respond to a request for inspection.

¶55 Moreover, this Court generally defers to a district court's decision regarding discovery sanctions "because the trial court is in the best position to know whether parties are disregarding the rights of opposing parties in the course of litigation and which sanctions for such conduct are most appropriate." *See Delaware v. K-Decorators*, 1999 MT 13, ¶ 86, 973 P.2d 818, ¶ 86. This Court has consistently held that discovery abuses should not be dealt with lightly, and that they should be punished rather than encouraged. *K-Decorators*, ¶ 87. Furthermore, Rule 37(b)(2) requires that courts order payment of attorney's fees and costs by the party, or the party's attorney, that fails to obey a court's discovery order, unless the court finds that the circumstances would make such an award unjust. *See* Rule 37(b) M.R.Civ. P.; *see also K-Decorators*, ¶ 88. In this case, as demonstrated by the court's findings, the circumstances did not make such an award unjust.

¶56 Beyond Rule 37 sanctions, the District Court had the power to award attorney's fees and costs pursuant to § 40-4-110, MCA, which provides as follows:

> Costs -- professional fees. (1) The court from time to time, after considering the financial resources of both parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under chapters 1 and 4 and for professional fees, including sums for legal and professional services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the professional, who may enforce the order in the professional's name.

In the instant case, the District Court's findings of fact indicate that it took both the Rule 37 sanctions and § 40-4-110, MCA, into account when it awarded Annette attorney's fees

and costs.

¶57 This Court has held that an award of attorney's fees under § 40-4-110, MCA, must be reasonable and necessary, and supported by competent evidence. *See Marriage of Gingerich*, 269 Mont. at 168, 887 P.2d at 718. Furthermore, the party requesting attorney's fees has the burden of demonstrating the necessity of the award. *See Gingerich*, 269 Mont. at 168, 887 P.2d at 718.

¶58 Here, there was sufficient evidence to support the District Court's award of attorney's fees and costs to Annette pursuant to § 40-4-110, MCA. There was evidence that Annette had to resort to borrowing money from her family to pay her attorney's fees during the pendency of this case. Additionally, the court found that the parties' income earning potential was substantially unequal. The court had detailed evidence before it regarding the assets, income, and potential income of the parties.

¶59 Pursuant to both § 40-4-110, MCA, and Rule 37, the court had ample authority to award Annette's attorney's fees and costs associated with this case. We, therefore, affirm the decision of the District Court.

ISSUE 4

¶60 Did the District Court err when it did not award Ron child support and medical expenses for the couple's minor child, and when it adopted the terms of the final parenting plan?

¶61 Ron urges that the District Court should have required Annette to pay child support because their youngest child had decided to live primarily with him. Both parties submitted child support guideline calculations to the court along with their proposed findings of fact. Additionally, both parties supplied the court with proposed final parenting plans. The court had the benefit of both parties' child support calculations, both of the parties' proposed parenting plans, and the testimony provided at trial on which to base its decision.

¶62 Ron's proposed parenting plan, like the plan adopted by the court, recognized that Meghan was fully "capable of making her own decisions about where she wishes to live. The parents should honor that decision but they should not try to influence where Meghan lives . . . . The parents and Meghan should try to maximize the amount of time that

Meghan spends with each parent." At the time the court issued the final parenting plan, Meghan was 16. The court found that there was no evidence presented that indicated that the parties and their daughter could not work out an appropriate time sharing schedule. The final parenting plan provided that Meghan should spend substantial time living at each parent's residence, and that she was old enough to be allowed to go freely between Annette's and Ron's homes after consulting with them.

¶63 In its findings of fact, the court stated that:

> Husband has considerably greater income earning ability than Wife. Husband will spend more time with Meghan. Wife has far less income earning ability than Husband. Wife will spend less time with Meghan. The natural consequence of this parenting arrangement is that Husband, with his greater income will directly provide more of Meghan's economic support and Wife with her much small [sic] income will provide less. Under these circumstances it is equitable and in Meghan's best interests that neither party be required to pay child support to the other. By the same token, Husband should not pay child support to Wife for the time she maintained the primary residence for Aaron and Meghan following the separation of the parties . . . .

¶64 Because the final parenting plan provided that Meghan should have freedom in deciding which parent to spend time with and when, it was unclear how much time she will actually be spending with each parent. The only certainty provided for in the plan, other than the holiday schedule, was that Meghan would spend "substantial amounts of time" with both parents and that she would have a voice in where she stayed and for how long. Under these circumstances, the court's determination that neither parent should pay child support was not an abuse of discretion. The court's child support determination reflected the terms of the final parenting plan and realistically reflected the living arrangements and financial situations of the parties. *See In re Marriage of Anderson* (1993), 260 Mont. 246, 255, 859 P.2d 451, 457.

¶65 We conclude that in arriving at its final parenting plan and child support determination, the District Court did not abuse its discretion. Therefore, we affirm the District Court's final parenting plan and child support determination.

¶66 We affirm the final decree of the District Court in all respects.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART